IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | |
|---|---|
| SUSAN NORRIS, | * |
| | * |
| Plaintiff, | * |
| | * |
| vs. | *   No. 1:05CV00062 |
| | * |
| JACQUITA ENGLES, Individually and in | * |
| her Official Capacity as an employee of the | * |
| Independence County Sheriff's Department | * |
| and KEITH BOWERS, in his Official Capacity | * |
| as Sheriff of Independence County, Arkansas, | * |
| | * |
| Defendants. | * |

**Memorandum Opinion and Order**

Plaintiff Susan Norris brings this action pursuant to 42 U.S.C. § 1983, alleging violation of her constitutional rights guaranteed by the Fourth and Fourteenth Amendments. The matter is before the Court on defendants' motion for summary judgment. Plaintiff responded to the motion, defendants replied to the response, and plaintiff responded to the reply. After careful review of the motion, responses, reply, briefs, statements of undisputed facts, and exhibits, the Court finds the motion should be granted in part and denied in part.

**Background**

Norris was diagnosed with manic bipolar depression when she was fifteen years old. She is taking a number of prescription drugs, some of which are taken via an intravenous line implanted in her arm, a PICC line. In March 2005, Norris was being treated by Dr. Ron Bates and seeing a psychiatrist, Dr. Holden. Norris testified that when she hurt emotionally, she had the urge to cut herself so that the sad emotion would go away. Sometimes she would cut herself in an attempt to

escape and shut down her emotions. Norris' cutting usually consisted of a one- to two-inch long incision of her abdomen.

On March 21, 2005, Norris was sad that her husband did not spend time with her. In an attempt to work out her feelings verbally instead of physically, she call the Vista Health Hotline in Fayetteville, Arkansas, where Holden works. She was unable to reach Holden; instead, she talked to a woman who was unfamiliar and who did not understand what Norris meant when she said she was trying to "fight the urge." Norris told the woman she did not want to cut but the urge was very strong. She told the woman how she was feeling and that she wanted to cut. Norris did not believe the woman understood what "cut"meant. The woman told Norris to go to the hospital. Norris hung up because she did not think the woman was helping her. After she hung up, she went to talk to her neighbor, Mary Post. She told Post about calling the hotline, and she visited with Post until she was past the emotional state.

Amanda Simpson, with Vista Health, called the Batesville, Arkansas, police dispatch, advising that Norris was threatening suicide. Dispatch contacted Jeremy Page who was a deputy with the Independence County Sheriff's Department. Deputy Page made contact with Norris at Post's house. He said Mr. and Mrs. Post were concerned about her welfare. He also said that at some point during their conversation, Norris stated she was considering suicide, and made the statement that she wanted to die. Deputy Page testified that after Norris made those statements, he determined he had to take Norris for her protection. He took Norris to the county jail where she was processed.

Separate defendant Jacquita Engles was on duty the night Page brought Norris to the jail. Engles said Page told her Norris was a protective custody hold and that she was trying to harm

herself. Page gave Engles Norris' purse which contained her medication. Norris asked Engles at that time if she could have her medication. Engles did not know how to administer medication through a PICC line. Deputy Page indicated to Engles that Norris could administer the medication to herself at the book-in desk. Norris was the first inmate Engles had seen come in with a PICC line, and she realized Norris might have a serious medical issue.

Engles put Norris in a padded cell and told Norris she would have to strip and wear a paper gown. Norris began to complain about being cold and squatted down beside the "bean pole." Engles squatted on the other side and got enough information from Norris to put her in the booking system. Norris told Engles she had thoughts of cutting herself and that cutting herself made her feel good. Norris admitted that she had experienced suicidal thoughts but Engles does not believe Norris told her she had thought about suicide that day. Norris showed Engles some of the cuts on her stomach, and Engles told Norris to replace the band-aids because the cuts might get infected. Norris was frustrated because she was cold and told Engles that she was going to pull out her PICC line and bleed to death. When Engles told Luke Lindsey, her supervisor, what Norris had said, he told her to handcuff Norris behind her back and she did. Norris was able to bring her hands in front of her, and Lindsey then told Engles to cuff Norris behind her back and take another pair of cuffs and handcuff her to the grate in the floor. Engles used a pair of leg irons in order to attach Norris to the grate. The grate served as an open toilet.

Later, Engles spoke to Mr. Bearden, the mental health screener, and told him she thought Norris' cuts were infected. Bearden told Engles to take Norris to the White River Medical Center and that he would come back to screen her. Engles and another jailer escorted Norris to the emergency room. Norris claims that when they were getting her ready to go to the hospital, Engles

hit her with handcuffs and either Engles or the other jailer kicked her. After her wounds were examined by a nurse practitioner, Norris was released and returned to the jail. Bearden eventually met with Norris; he recommended she be released and she was.

Norris filed this lawsuit alleging Engles' actions "violated the Plaintiff's rights under the Fourth and Fourteenth Amendment to the Constitution of the United States to be free from unreasonable searches and seizures, be free from the infliction of pain, and to be free from having her liberty deprived without due process of law." Compl. at ¶ 16. She claims Engles' actions were "so outrageous and barbaric as to shock the conscience of the Court," ¶ 17, and that she is entitled to compensatory and punitive damages. Norris alleges Sheriff Bowers "failed to develop policies for the safe and humane treatment of persons suffering from mental illness, knowing that such persons are taken into custody." ¶ 15.

Defendants move for summary judgment arguing there is no proof of a violation of constitutional rights, no proof of an unconstitutional County policy, and no proof to support punitive damages. Engles also asserts Norris' claims are barred by qualified immunity.

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citations omitted). Further, summary judgment is particularly appropriate where an unresolved issue is primarily legal, rather than factual. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

**Discussion**

**1. Individual Capacity Claims Against Jacquita Engles**

Norris asserts Engles violated her rights under the Fourteenth Amendments by detaining her in the county jail and by restraining her in a "totally unnecessary and unreasonable" manner. Pl's. Resp. to Mot. Summ. J. at 5. She contends Engles' actions were outrageous and shocking to the conscience "of any decent human being." *Id.* Norris also claims Engles used excessive force. Engles argues there is no proof of a constitutional violation and, even if there were, she is entitled to qualified immunity.[1]

---

[1] Although Engles denies she hit Norris with a pair of handcuffs or kicked her, she does not move for summary judgment on Norris' Fourth Amendment excessive use of force claim.

"Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn,* 439 F.3d 497, 501 (8th Cir. 2006)(citation omitted).

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . .

*Saucier v. Katz,* 533 U.S. 194, 201-202 (2001).

  a. **Detention at the County Jail**

The parties do not dispute that Norris was detained at the jail and not taken to a hospital. Norris contends that placing her in the county jail violated her substantive and procedural due process rights.

"To establish a procedural due process violation, a plaintiff need not only show a protected interest, but must also show that he or she was deprived of that interest without sufficient process, *i.e.*, without due process." *Swipies v. Kofka,* 419 F.3d 709, 715 (8th Cir. 2005). Norris seems to argue that a state statute addressing the commitment and treatment of the mentally ill creates a liberty interest in being taken to a hospital rather than a jail. Arkansas Code Annotated Section 20-47-210 sets forth a procedure for the immediate confinement and evaluation of a person who appears to be of danger to herself or others. It provides: "Whenever it appears that a person is of danger to . . . herself . . . and immediate confinement appears necessary to avoid harm to the person or others:

(1) An interested citizen may take the person to a hospital or to a receiving facility or program. If no other safe means of transporting the individual is available, it shall be the responsibility of the law enforcement agency that exercises jurisdiction at the site where the individual is physically located and requiring transportation . . ." The statute goes on to address the filing of a petition for involuntary admission and hearings that must follow such filing. In *Chatman v. State,* 985 S.W.2d 718, 722 n.2 (Ark. 1999), the Arkansas Supreme Court noted that "incarceration in jail is not the type of confinement or detention envisioned under the immediate-confinement statute. Ark.Code Ann. §20-47-210 (repl. 1991). Rather, the Sheriff's Department should have transported Chatman to a hospital or receiving facility or program." This, Norris argues, establishes her constitutional rights were violated when Engles held her in protective custody at the jail.

In *Bagley v. Rogerson,* 5 F.3d 325 (8th Cir. 1993), an inmate claimed state prison officials violated a state law when they failed to give him credit for time served in federal custody. The court stated: "We assume for present purposes that the state statute did require that Bagley be given the credit he requested. It is fundamental, however, that this does not amount to a Section 1983 claim. We have held several times that a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983." *Id.* at 328. In *Meis v. Gunter,* 906 F.2d 364 (8th Cir. 1990), an inmate claimed that a state statute which requires that inmates be informed of rules and policies concerning inmate rights and programs and opportunities available to inmates created a liberty or property interest in having the documents themselves available to inmates. In holding that the statute does not create a liberty interest for federal constitutional purposes, the court explained:

> [T]his is not the kind of state statute that would create a liberty interest as that term has come to be used in Fourteenth Amendment jurisprudence. The terms liberty and property interest are used in the context of procedural due-process claims. Thus, if the state says that an inmate is entitled to be paroled if certain substantive factual

> predicates are established, the inmate has a liberty interest in parole, and it cannot be denied until some appropriate sort of hearing has been held at which the inmate will be allowed to show the requisite factual predicates exist. It is commonly said that no liberty interest of this kind is created unless the state statute or regulation involved uses mandatory language and imposes substantive limits on the discretion of state officials. The statute quoted above certainly uses mandatory language, but it does not create a certain right or entitlement subject to specified factual findings. Rather, it is a direct command that certain information be conveyed. There is no question here of procedural due process. It is not claimed, for example, that Meis was entitled to some sort of hearing before the defendants decided not to deliver to him the [documents] he claims he has a right to. Instead, the state statute requires unconditionally that information with respect to the programs in question be given to all committed persons. A duty is imposed on prison authorities, and a concomitant right is created in the inmates.
>
> This is the language of substance, not procedure, and the concepts of liberty and property interests are, as we have noted, solely useful in the context of procedural due process. If we were to hold that the sort of state statute involved here created a liberty interest for federal constitutional purposes, we would be holding, in effect, every state statute which imposes a mandatory duty, or creates a legal right, is constitutional in nature, and the violation of every such statute would be a violation of the Due Process Clause of the Fourteenth Amendment. This is emphatically not the law. Many important rights and duties are created by state law entirely without regard to the federal Constitution. A violation of state law, without more, is not the equivalent of a violation of the Fourteenth Amendment.

*Id.* at 368-9.

The Court finds the facts alleged fail to show Engles' conduct in booking and keeping Norris at the county jail after she was delivered there by Deputy Page violated Norris' due process rights.

**b.   Treatment at the County Jail**

Norris also alleges the manner in which she was restrained at the jail violated her right to due process. "Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty. . . . [T]he state violate substantive due process when it engages in conduct that is so outrageous that it shocks the

conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.'" *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir. 1998) (citation omitted).

The Court finds that Norris has presented sufficient facts to establish an underlying constitutional violation. The Court further finds that the right was clearly established. Therefore, Engles is not entitled to qualified immunity on Norris' due process claim as to her treatment at the jail.

**2.     Official Capacity Claims**

Norris sues Engles in her official capacity as well. She also names Sheriff Bowers as a defendant in his official capacity. A lawsuit against a governmental actor in his or her official capacity is synonymous with a suit against the entity itself. Therefore, the official capacity claims against Engles and Bowers are actually claims against the County. *See Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent).

In a § 1983 action, a municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality. *Turney v. Waterbury,* 375 F.3d 756 (8th Cir. 2004). To succeed in her claims against the County, Norris must prove (1) a constitutional injury, *City of Los Angeles v. Heller,* 475 U.S. 796 (1986), (2) that an "official policy or widespread custom or practice" caused the injury, *Board of County Commr's v. Brown,* 520 U.S. 397 (1997), and (3) that through "deliberate conduct" the County was the "moving force behind the injury," *id.* at 404. The second requirement guards against holding a government body vicariously liable for the acts of all its employees, while the third requirement insures the necessary degree of culpability and causal link between official action and the deprivation of a constitutional right. In the absence of

a written policy, a plaintiff must identify a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law. *Jane Doe A v. Special Sch. Dist.,* 901 F.2d 642, 646 (8th Cir. 1990).

Because the Court determines Engles is entitled to qualified immunity for booking and detaining Norris, it need not address Norris' allegation that the County has a policy, practice or pattern of unconstitutionally taking and detaining mentally impaired persons at the jail. *See McCoy v. City of Monticello,* 411 F.3d 920 (8th Cir. 2005)(in order for municipal liability to attach, individual liability of a municipal employee must first be found on an underlying substantive claim). However, because Engles is not entitled to qualified immunity as to Norris' claim that her treatment at the jail violated her substantive due process rights, the Court must address the question of the County's liability on this claim.

The County has a written policy regarding special detainees and suicide prevention. The suicide prevention policy provides that the removal of clothing from a suicidal detainee as well as the use of physical restraints should be avoided whenever possible, and only utilized as a last resort for periods in which the detainee is physically engaging in self-destructive behavior. *See* Defs.' Statement of Facts, Ex. 6. The County admits that its practice is to remove all clothing from individuals who are in protective custody as a risk to themselves or others, when the jail staff believes that the individual intends to harm herself or states she intends to harm herself. As to physical restraints, Bowers testified that its policy is to do "whatever the guard at that time feels is necessary to do a certain thing to keep them from hurting themselves." *See* Pl's. Statement of Facts, Ex. 6 (Bowers Dep.) at 65.

The suicide prevention policy further provides that all detention officers shall receive eight hours of initial suicide prevention training within two months of employment, followed by two hours of actual training in suicide prevention. *See* Defs.' Statement of Facts, Ex. 6. Sheriff Bowers testified that in some cases, due to manpower issues, officers are not sent for the training within two months. *See* Pl's. Statement of Facts, Ex. 7 (Bowers Dep.) at 18-19. Ms. Engles testified at her deposition in February 2006 that she had been employed at the jail for approximately eighteen months. She said she had not been to jail standards school before Norris was brought in, and had been employed at the jail for approximately six months before she went to jail standards school in June 2005. She does not remember how much of the 40-hour jail training class was devoted to the handling of inmates with mental issues. *See* Defs.' Statement of Fact, Ex. 3 (Engles Dep.) at 4-5. Rhonda Faircloth Dowell, who has held a number of positions with the Independence County Sheriff's Office over a period of fourteen years, testified that the basic jailer training course she took touched on handling inmates with mental problems. She said she took an eight-hour class offered by North Arkansas Human Services ten or eleven years ago, but it did not cover restraining individuals who were suspected of being suicidal or were threatening or planning to cause harm to themselves. *Id.*, Ex. 5 (Dowell Dep.) at 8-9, 22-4. According to the jail log, Michael Darr, a corporal at the jail, took part in getting Norris ready to go to the hospital. *See* Defs.' Statement of Facts, Ex. 4 (Darr Dep.) at 10-11. He testified that although he had training on the Breathalyzer test for drunk driving and CPR class, he had no training on handling inmates with mental problems except through the basic jailer training and on-the-job training. *Id*. at 6-8, 22-4.

Norris argues that the County's policy to leave it up to the individual employee as well as the fact that the Independence County Detention Center employees have received no specialized


training in restraining detainees with mental health problems establishes a genuine issue of material fact as to whether there was a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law. The Court finds there are genuine issues of material fact as to whether an official policy or widespread custom or practice caused the alleged injury, and whether the County was the moving force behind the injury. Therefore, the motion for summary judgment on the official capacity claim regarding Norris' treatment is denied.

**3. Punitive Damages**

Norris argues she is entitled to punitive damages as to her claims of excessive force and unconstitutional physical restraints. Punitive damages are recoverable in § 1983 actions. *Webb v, Arresting Officers,* 749 F.2d 500, 502 (8th Cir. 1984). A jury may award punitive damages if it finds the defendant's conduct was motivated by evil intent or was recklessly or callously indifferent to a plaintiff's rights. Viewing the evidence in the light most favorable to Norris, the Court finds there is a genuine issue of material fact as to whether she is entitled to punitive damages.

**Conclusion**

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [docket entry 10] is hereby granted in part and denied in part. The motion is granted to the extent that Norris' claim against defendants as to her detention at the jail instead of the hospital is dismissed. The motion is denied as to all remaining claims.

DATED this 18th day of September 2006.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE